508 So.2d 1346 (1987)
STATE of Louisiana
v.
Garold T. BATES.
No. 87-K-0656.
Supreme Court of Louisiana.
June 11, 1987.
Wellborn Jack, Jr., Rebecca L. Hudsmith, Jack & Hudsmith, Shreveport, for relator.
Charles B. Bice, Dist. Atty., Winngield, for respondent.
PER CURIAM.
The defendant Garold Bates was indicted for the aggravated rape of an 85-year old woman. A jury returned a verdict of guilty of forcible rape. The court sentenced Bates to serve 30 years at hard labor, five years of which is to be served without benefit of probation, parole or suspension of sentence. The Second Circuit affirmed both conviction and sentence. State v. Bates, 501 So.2d 950 (La.App. 2nd Cir.1987).
Defendant's conviction was obtained with a jury whose members had been contacted by the District Attorney before trial, along with all of the other jury veniremen, by a letter and questionnaire. The questionnaire was to be completed and returned to the District Attorney for his exclusive pre-trial perusal, to aid him in his jury selection at trial.
This letter from the District Attorney was directed to each of the 100 veniremen for defendant's trial. The letter was on the official letterhead of the District Attorney, and displayed his seal of office, his name, and his regular business telephone number. It was personally signed by the elected District Attorney, and instructed the prospective juror to "complete the enclosed questionnaire and return the completed form in the enclosed postage pre-paid envelope." It cautioned the reader to "be certain to answer all questions," and directed all potential jurors to "call the District Attorney's Office at 638-2324 anytime after 5:00 p.m. on the day before the date listed on your summons." The letter advised the prospective juror that a recorded message would let him or her know whether it would be necessary to obey the summons and appear in Court the next day, and that "[f]or convenience, this information will also be available to you each evening after 5:00 p.m. during the regular jury term for which you have received a summons." It did not tell the prospective juror with whom he would speak or what kind of information he would get if he called the number during regular business hours. The letter concluded by thanking the potential juror "for your cooperation."
*1347 Eighty-eight potential jurors returned completed questionnaires to the District Attorney, thus providing him with not only basic demographic information about themselves and their families but also details about their important life experiences. The information included references to close friends or relatives in law enforcement, whether they or close friends or relatives had ever been the victim of a crime and if so, "who, what, and when," whether the juror had ever been a witness in a criminal case, served on a grand jury, served on a criminal jury in state or federal court, reached a verdict, etc.
The District Attorney collected this information without the knowledge of the defendant or his counsel. In fact, it was not until after a day and a half of voir dire that the defendant and his attorney discovered during the examination of juror Cardozier that these letters had been written and these questionnaires returned to the D.A. and used by him in selecting the jurors. By the time this discovery was made during the voir dire of juror Cardozier, seven jurors had already been selected and sworn and sixteen additional jurors had been questioned and excused.
Upon discovering that there had been ex parte contact by the District Attorney with a venireman, defense counsel requested that the jury be excused and commenced to make a series of requests, motions and arguments. Counsel requested and obtained production of a sample letter and all except seven of the completed questionnaires. He requested that a copy of the recording that jurors listened to be placed in the record, and requested an opportunity to "question the employees of the District Attorney's office about whether they received any telephone calls from anyone ... any prospective jurors," in order to discover what communications transpired between employees of the D.A.'s office and prospective jurors who may have called during regular working hours.
Counsel argued further that the D.A.'s office had "provided a public service, an ingratiating public service to the jurors here." Counsel urged that the ex parte contact with the entire venire was "inherently prejudicial. It gives the District Attorney a leg up ... if nothing else, Your Honor."
The court then responded to the arguments advanced by counsel by ordering the D.A. to furnish defense counsel with the questionnaires for the other jurors, and the recorded telephone message if it was still on the machine. The court refused to allow defense counsel to question employees of the D.A.'s office. Counsel requested that the letters, questionnaires and the recording be made part of the record in support of the motion for a mistrial.
Seven jurors were selected in defendant's case before defense counsel even became aware of the D.A.'s ex parte communications with the veniremen, and his possession of 88 returned jury questionnaires containing useful background voir dire information. The trial judge denied defendant's request for a mistrial and to have the jury venire quashed. The trial court also denied defendant's request that the jury be instructed that defense counsel did not similarly contact all jury veniremen prior to trial because such conduct constituted a violation of the then-existing Disciplinary Rule 7-108(A).[1] The seven previously selected jurors, along with those selected after defense counsel learned of the pre-trial communications by the lawyer prosecuting the case, returned a verdict of guilty of forcible rape.
The Second Circuit determined that the practice was a harmless one, but conceded that "juror questionnaires and scheduling information are best handled and provided under judicial auspices ..." State v. Bates, supra, 501 So.2d at 953. Indeed, far from being troubled by the practice, the appellate court appears to have encouraged it as a "time-saving device ... within the scope *1348 of voir dire examination." Id., 501 So.2d at 952.
While such jury background information questionnaires are not without precedent, and their use may indeed be expanding,[2] at least one commentator implicitly notes the unusual procedure employed in the instant case, where only one party routinely has access to the information.[3]
It is settled at the federal and state level that any private communication, direct or indirect, with a juror after the beginning of trial is deemed presumptively prejudicial, if not made with full knowledge of all parties and pursuant to court order or rule. Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); State v. Sinegal, 393 So.2d 684 (La.1981). The defense argues for a similar rule in a pre-trial context, noting that the impact of such unauthorized communications may be harder to demonstrate but no less pernicious. The argument reflects the common understanding of the defense bar. In fact, a leading defense manual on jury selection warns unequivocally that "[p]rospective jurors and members of their families are never interviewed or contacted." National Jury Project, Jurywork: Systematic Techniques, § 9.03(1)(b)(ii) (1986) [emphasis in the original] (see, n. 3, supra). Although courts have yet to address the precise issue presented by this case, the Eighth Circuit's opinion in Gideon v. United States, 52 F.2d 427, 429 (8th Cir.1931) provided a commentary which appears to be especially cogent to the case before the Court. Reversing a conviction where the clerk of court had sent out juror questionnaires not unlike those disseminated in the instant case, again without authorization of the judge, the appellate court observed that
[h]ad such a questionnaire been sent out by attorneys for some of the defendants awaiting trial, we cannot doubt that the proceeding would have been open to severe criticism. We cannot escape the conviction that the sending of the questionnaire under the guise of governmental authority was equally reprehensible. Id., 52 F.2d at 429.
The effect of the questionnaire upon the jurors, a questionnaire which ultimately found its way into the hands of the prosecution, the court opined, must have been "baneful." Id. The appellate court added:
Under our system of administering criminal law, the jury is a feature of the very highest importance. The selection of the jury is not a mere gesture. The rhetorical remark of a British statesman that `The whole machinery of the state, all the apparatus of the system, and its varied workings, end in simply bringing twelve good men into a box,' carried a real truth. Although men may differ widely as to the merits of the jury system, yet it would seem to be apparent that unauthorized communications with jurors, such as the one here under consideration, whether by private litigants or by public officials are not calculated to *1349 increase respect for the system nor to eliminate its faults.
* * * * * *
The qualifications of a juror should be ascertained by questioning in open court in the presence of the parties interested and while the juror is under oath. Secret preliminary questioning is unauthorized, and, in our opinion, should not be encouraged. It is open to the danger of many and serious abuses, and trenches upon the broad ground of fair trial. Id., 52 F.2d at 429.
The ABA may have envisioned just such a practice when the applicable standards and rules of professional conduct were devised. As was indicated above, DR 7-108(A), which was in effect at the time these events transpired, appears to forbid expressly and unequivocally any such contacts: "... a lawyer ... shall not communicate... with anyone he knows to be a member of the venire ..."[4] Should the applicable rules leave any question open as to the ABA's view of this practice, the doubt is dispelled by its Informal Opinion, in which one District Attorney poses the following query:
1. In my capacity as District Attorney, in the interest of accuracy and reduction of costs, and in the interest of avoiding inquiries to neighbors (which I have found is sometimes resented), I devised a questionnaire which is forwarded to jurors called for criminal court duty. This questionnaire is forwarded without a covering letter of any sort, and the only direction appearing thereon is that it is to be returned to this office. No signature of the District Attorney or any Assistant District Attorney or other personnel connected with the District Attorney's Office is appended. A return self-addressed stamped envelope is likewise forwarded.
It has been the belief of the writer that this type of inquiry does not violate Canon 23, since it is not submitted with reference to any specific case nor any specific cause, and covers general rather than specific areas of information. The question therefore is whether or not such questionnaire is a violation of Canon 23 or involves any misconduct.
The ABA did not waiver in its condemnation of such a practice, despite the absence of a cover letter from the D.A.'s office as was used in the instant case:
It is the Opinion of the Committee that it would be and is unethical for you as District Attorney to transmit such a questionnaire to jurors called for criminal court duty, and that it is unethical for you to send to jurors the `citizenship service card.'
As to Question 1, it clearly involves communicating with jurors before the trial, although to some extent the questionnaire relates to matters foreign to causes that might come before the jurors if called. As a District Attorney you are potentially an attorney in each criminal case that is likely to come before the jurors, and such a proposed questionnaire by you is clearly in violation of Canon 23 which provides as follows:
"All attempts to curry favor with juries by fawning, flattery or pretended solicitude for their personal comfort are unprofessional. Suggestions of counsel, looking to the comfort or convenience of jurors, and propositions to dispense with argument, should be made to the Court out of the jury's hearing. A lawyer must never converse privately with jurors about the case; and both before and during the trial he should avoid communicating with them, even as to matters foreign to the cause."

Informal Ethics Opinions, Vol. II, Committee on Ethics and Professional Responsibility of the American Bar Association, ABA 1975, Opinion # 1055, pp. 243-244.
*1350 Thus, it appears that the Second Circuit's view is squarely at odds with that of federal courts, as well as the position held by American Bar Association commentators, in its embrace of a practice which "trenches upon the broad ground of fair trial." The reasons for the ABA's condemnation of such a practice are obvious: unilateral ex parte juror contacts can only result in a skewing of the otherwise impartial administration of justice. No authority can be found for permitting the practice to continue. Of course, bilateral ex parte contact would prove even worse. If nothing else, the daunting prospect of the district attorney and defense counsel each bombarding the venire with personal questionnaires in a battle for the hearts and minds of the prospective jurors shows the importance of this issue to the fair administration of justice in Louisiana.
The conviction and sentence are reversed and vacated, and the case is remanded to the trial court for a new trial.
LEMMON, J., concurs.
NOTES
[1] DR 7-108(A) provides:

Before the trial of a case a lawyer connected therewith shall not communicate with or cause another to communicate with anyone he knows to be a member of the venire from which the jury will be selected for the trial of the case.
[2] The ABA recommends that counsel be provided with basic background information about each prospective juror, including, age, gender, occupation, educational level, marital status, prior jury service, geographic area in which the juror lives, occupation of the juror's spouse, and the age of the juror's children. The rationale provided by the ABA is that such questionnaires expedite voir dire proceedings while providing the court and the parties with necessary information about jurors. Jurywork, Systematic Techniques, National Jury Project, Inc., Elissa Krauss and Beth Bonora, Eds., Clark Boardman Company, Ltd., New York, 1986, p. 2-39. [emphasis provided]
[3] The National Jury Project's Jurywork: Systematic Technology (2nd Ed., 1986) provides a number of arguments in favor of the use of such questionnaires by judges, and notes that the questionnaire is "generally a supplement to voir dire, designed to increase the efficiency of the process for the judge, the parties, and the jurors." Id., § 2.08, p. 2-43. While noting that such questionnaires are generally tailored for use in a specific case, some jurisdictions now routinely use a brief background questionnaire. Completed questionnaires for all prospective jurors on a panel for a particular case are distributed to counsel for both sides prior to voir dire questioning. Id., esp. footnote 48. [emphasis provided] Of particular note is the writer's emphasis on the judge as the sponsor of such questionnaires, a procedure clearly at odds with the practice by the Winn Parish District Attorney for the past 13 years of benefitting unilaterally from his background questionnaires.
[4] This Court has adopted new rules of professional conduct since the time this case was tried. The new rule works no change in the law. It provides that "a lawyer shall not ... communicate ex parte with [a prospective juror] except as permitted by law." Rule 3.5(b), Model Rules of Professional Conduct.